# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2333
_____

Hugo Aguilar Montecinos

*Petitioner*

v.

Merrick B. Garland, Attorney General of United States

*Respondent*

_____

No. 22-1438
_____

Hugo Aguilar Montecinos

*Petitioner*

v.

Merrick B. Garland, Attorney General of United States

*Respondent*
_____

Petition for Review of an Order of the
Board of Immigration Appeals
_____

Appellate Case: 21-2333     Page: 1     Date Filed: 02/10/2023 Entry ID: 5244591

Submitted: December 13, 2022
Filed: February 10, 2023

_____

Before SMITH, Chief Judge, ARNOLD and STRAS, Circuit Judges.

_____

ARNOLD, Circuit Judge.

After conceding that he was removable from the United States for entering the country without being admitted or paroled, *see* 8 U.S.C. § 1182(a)(6)(A)(i), Hugo Aguilar Montecinos applied for asylum on the ground that gangs in his native Honduras had persecuted him in the past and that he feared persecution from them should he return there. An immigration judge and the Board of Immigration Appeals determined, as relevant, that any harm Aguilar had suffered bore no connection to his political opinions and denied his application. Aguilar petitions our court for review of the agency's decision and his motion to reconsider that decision, and we deny the petitions.

In his initial application for asylum, Aguilar explained that he had been "threatened by the gang MS-13 because they wanted me to help collect 'rent' from people because I had a car," and he expressed a fear that, should he return to Honduras, "police and Ms13 can torture you, [and] the authorities would never find out." In a supplement to that application Aguilar provided a declaration explaining that, one afternoon in November 2012, four armed people robbed him and his wife of money and personal documents, among other things, and threatened to kill them if they told police. A week later Aguilar found a note on his car stating that "we have all of your information, where you live, what you do, what can you own, and you move around a lot in your car." It then said that "we want you [to] help us collect the war tax," and if he did, it "can save your life also your brothers, your wife's and children." Finally, the note warned, "We will be calling and we will be aware of you

Appellate Case: 21-2333    Page: 2    Date Filed: 02/10/2023 Entry ID: 5244591

and if you do not do it, you will be dead. MS13." Aguilar testified before an immigration judge that he didn't contact police "[b]ecause many times the police is actually working with them." Aguilar reported that, after he found the note, "[t]hey kept calling me, threatening me, and leaving me intimidating messages." He testified that they threatened to kill him and that they called two or three times a week for the next month or two. When asked why he thought the gang had selected him to collect the war tax, he surmised, "I think they did it because I have to go all over the country, and I am an honest person with no problems."

Aguilar also provided a statement from his wife, who still lives in Honduras, in support of his application. She reported that, in October 2016, her neighbors were the victims of an armed robbery at their home. At some point during the robbery, the culprits told the neighbors "sorry man, made a mistake" and left. They then knocked on Aguilar's wife's door, but she didn't answer and wasn't harmed. Aguilar appears to suspect that the robbers were gang members who were looking for him or his family. Aguilar also submitted evidence that Honduran gangs like MS-13, sometimes with the help of police, have demanded that certain people who travel throughout the country collect a "war tax" and that many people have been killed for refusing to do so. He also testified that Honduran gangs are so big that "they are actually part of the government." Finally, he provided his mother's death certificate as evidence that gangs were targeting his family, though his attorney admitted that the certificate doesn't say that someone murdered Aguilar's mother.

In rejecting the claim that any actual or imputed political opinion of Aguilar's was at least one central reason for his mistreatment, the IJ explained that Aguilar "has never expressed any political opinion or anti-corruption sentiment" that could be characterized as political opinion, "nor is there any evidence that the gang has imputed to him such a position." The IJ noted that mere resistance to assisting a criminal enterprise is insufficient to qualify as political opinion. The IJ also pointed out that it appeared the gang targeted Aguilar "because he had a car and traveled to

different parts of Honduras, and therefore, would be a useful tool to further the criminal efforts of the MS 13 Gang."

The BIA upheld the IJ's decision, explaining that the IJ "did not clearly err in finding the gang members were not and would not be motivated to target the respondent because of his actual or imputed political opinion." It rejected Aguilar's contention that his refusal to collect the "war tax was viewed as an act of resistance to the gang, which operates as a de facto government in Honduras," explaining that the IJ could reasonably believe that the dispute between Aguilar and the gang was a product of "general criminality," and not an effort to punish someone for his political views. Aguilar also failed to provide any evidence, the BIA said, that the gang imputed a political opinion to him, and it appeared that the gang targeted him merely for economic gain.

Aguilar maintains that the BIA erred in holding that no "nexus" exists between any actual or imputed political opinion and Aguilar's past mistreatment or current fears. To be eligible for asylum, Aguilar must show that he is a refugee, *see* 8 U.S.C. § 1158(b)(1)(A), who is unwilling or unable to return to his home country "because of persecution or a well-founded fear of persecution on account of . . . political opinion." *See id.* § 1101(a)(42)(A). To demonstrate the requisite nexus between Aguilar's persecution and his political opinion, he must show that "political opinion was or will be at least one central reason for persecuting" him. *See id.* § 1158(b)(1)(B)(i). Though a central reason need not be the sole reason, it must be more than incidental or tangential. *See Gomez-Rivera v. Sessions*, 897 F.3d 995, 998 (8th Cir. 2018). Because we review the agency's nexus holding for substantial evidence, we will reverse only if we determine that a reasonable factfinder would have to conclude that Aguilar's actual or imputed political opinion motivated his persecutors' actions sufficiently to qualify him for asylum. *See Silvestre-Giron v. Barr*, 949 F.3d 1114, 1117–19 (8th Cir. 2020).

An asylum applicant's refusal to assist or join a gang is often unrelated to the applicant's political opinions. For example, in *Marroquin-Ochoma v. Holder*, 574 F.3d 574, 576 (8th Cir. 2009), an applicant had received threatening notes and phone calls from a gang in her native Guatemala demanding money, but she resisted and fled. The applicant asserted before our court that the gang's "threats were motivated by an anti-gang political opinion that the gang members imputed to her based on her refusal to join the gang or otherwise succumb to their extortionate demands." *See id.* at 577. We upheld the agency's determination to the contrary and rejected the applicant's contention that the gang wasn't a "garden variety street gang" but "political in nature" and so "the mere refusal to join the gang is therefore sufficient to find an imputed political opinion." *See id.* at 578. We explained that "evidence that the gang is politically minded could be considered evidence that the gang members would be somewhat more likely to attribute political opinions to resisters," but "a generalized 'political' motive underlying the gang's forced recruitment would be inadequate to establish" that "the gang believes resistance to those recruitment efforts is based on an anti-gang political opinion." *See id.* After all, even a person who supports a gang might refuse to assist it for reasons other than political opinion, such as fear that gang rivals might target the applicant or "fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few." *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 482 (1992). The record here simply does not contain much evidence, if any, that Aguilar's refusal to assist the gang, even one as powerful and politically influential as MS-13, was meant to reflect a political opinion, or that the gang thought his refusal was due to a political opinion.

Aguilar asserts that the IJ and BIA did not carefully examine the record but simply assumed that any opposition to a criminal organization is necessarily apolitical. It is true that "careful attention to the particular circumstances surrounding the alleged persecution remains necessary even if the persecution is generally categorized as extortion or recruitment." *See Marroquin-Ochoma*, 574 F.3d at 577.

The circumstances could show that, even if a gang's actions amounted to extortion, the gang might have been motivated to persecute the victim because of a statutorily protected ground. For example, in a case Aguilar relies on, *De Brenner v. Ashcroft*, 388 F.3d 629, 637 (8th Cir. 2004), our court concluded that it was "an oversimplification" to characterize the threats made in that case "as simple extortion without carefully examining the record for particularized evidence of imputed political opinion." The record there showed that an asylum applicant who resisted gang recruitment in Peru was eligible for asylum because her persecution was sufficiently related to gang-imputed political opinions. The gang had labeled the applicant and her family as members and supporters of the ruling party. It had also mistakenly identified her as the personal secretary of a senior, active member of the party. And the record showed that the persecutors had imputed certain political opinions to all wealthy Peruvians like the applicant. *See id.* at 636–37. But the record here contains nothing of the sort.

Aguilar's contention that the IJ and BIA failed to examine the record adequately in reaching their conclusions is untenable. The IJ recounted the gang's interactions with Aguilar and concluded that he never expressed any political opinion or anti-corruption sentiment, or that the gang imputed those things to him—conclusions that find ample support in the record. We read the IJ's opinion to say that, unless the record provides some reason to think that a gang's persecution of an asylum applicant relates to the applicant's actual or imputed political opinions, refusal to comply with gang demands alone is insufficient to demonstrate the requisite nexus. That seems unexceptionable. The BIA similarly recounted the gang's interactions with Aguilar, pointed out that he hadn't provided evidence that gang members imputed a political opinion to him, and noted that it was not error for the IJ to hold that the gang's motivation was economic in nature. The agency therefore did not take the improper shortcut that Aguilar says it did.

Aguilar also maintains that we should grant his petition because the BIA failed to address his request that it take administrative notice of an indictment in the Southern District of New York against the brother of Honduras's president for drug trafficking. Aguilar says that the allegations in the indictment show "the Honduran government's deep involvement with organized crime made the MS-13 functionally a quasi-governmental entity" and so blurs the line between government and gang.

We agree with Aguilar that the BIA, in resolving his appeal of the IJ's decision and his motion to reconsider, appeared to misapprehend either his request or its authority to take administrative notice should it choose to do so. *See* 8 C.F.R. § 1003.1(d)(3)(iv). But we think the BIA's apparent error was harmless because we have "not the slightest uncertainty as to the outcome of [the] proceeding" were we to remand the case, as any error "clearly did not affect the outcome" of Aguilar's appeal or his motion to reconsider. *See Prohibition Juice Co. v. U.S. Food & Drug Admin.*, 45 F.4th 8, 24 (D.C. Cir. 2022). The indictment was largely duplicative of the country-conditions evidence that Aguilar had already submitted to the BIA in that it tended to show that Honduras is plagued by corruption and that certain government officials and members of the police assist gangs in their drug-trafficking pursuits. Though the indictment provides a specific example of potential corruption, we do not think it would have influenced the BIA to reach a different result, especially since it does nothing to cure the deficiencies in Aguilar's asylum request, namely, the lack of evidence that his resistance to the gang had anything to do with an actual or imputed political opinion.

Despite Aguilar's contention to the contrary, our determination that any error was harmless does not violate the so-called *Chenery* doctrine. Under that doctrine, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency," and "[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by

substituting what it considers to be a more adequate or proper basis." *See Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). But as our sister circuits have explained, the *Chenery* doctrine doesn't prohibit courts from considering whether an agency error is harmless. *See, e.g.*, *Prohibition Juice*, 45 F.4th at 24; *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010); *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 61 (1st Cir. 2001); *see also Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 246–48 (1964). The Administrative Procedure Act requires courts, in reviewing agency action, to take "due account" "of the rule of prejudicial error," *see* 5 U.S.C. § 706, and that is what we do here.

Aguilar also asserts that the BIA's reliance on *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018) (*Matter of A-B- I*), requires that we grant his petitions because that decision has been vacated. *See Matter of A-B-*, 28 I. & N. Dec. 307 (A.G. 2021) (*Matter of A-B- II*). Indeed, the BIA relied on *Matter of A-B- I* when, in explaining that Aguilar had not established a nexus between the gang's mistreatment of him and his political opinions, it said "that acts of personal or private violence would not ordinarily satisfy the nexus prong of persecution analysis." The attorney general, though, vacated *Matter of A-B- I* at least in part because he thought it "could be read to create a strong presumption against asylum claims based on private conduct." *See Matter of A-B- II*, 28 I. & N. Dec. at 309.

We nonetheless conclude that remand is unnecessary because Aguilar already brought this matter to the BIA's attention, and the BIA held that vacatur of *Matter of A-B- I* didn't affect Aguilar's asylum application. In so holding, the BIA explained that, even without a presumption against asylum claims involving persecution by private actors, Aguilar had failed to show that his actual or imputed political opinions had anything to do with the gang's mistreatment of him. In other words, Aguilar's asylum application failed under "legal authority that remains valid." We discern no error on this point.

Finally, Aguilar maintains that the BIA erred when it refused to consider his request for withholding of removal. *See* 8 U.S.C. § 1231(b)(3). In deciding Aguilar's appeal, the BIA said that Aguilar had not challenged the IJ's ruling on withholding of removal, and so it deemed the matter waived. When Aguilar moved the BIA to reconsider, it explained that he didn't raise any meaningful arguments regarding withholding of removal. Aguilar says that he did and that the arguments he makes regarding his asylum application apply with equal force to his request for withholding of removal.

Aguilar had to raise issues with the agency before challenging their resolution here. *See Bakor v. Barr*, 958 F.3d 732, 739 (8th Cir. 2020). If a petitioner "fails to raise a particular issue when he appeals to the Board, the petitioner has not exhausted his administrative remedies with respect to that issue." *Ramirez v. Sessions*, 902 F.3d 764, 770 (8th Cir. 2018). We agree with the BIA that Aguilar failed to appeal the IJ's determination on withholding of removal. While Aguilar adverted to withholding of removal a few times in the relevant brief, he did so only when reciting the actions that the IJ took or the names of documents at issue. On the other hand, he clearly challenged the IJ's asylum determination, dedicating a large portion of his brief to the "substantive requirements for asylum" and concluding that he "is statutorily eligible for asylum." So we find no fault with the BIA interpreting Aguilar's appeal as relating only to the IJ's asylum decision.

Petitions denied.

_____

-9-

Appellate Case: 21-2333    Page: 9    Date Filed: 02/10/2023 Entry ID: 5244591